Charles T. Major, J.
This is a claim to recover damages for the wrongful death, of Anthony Malvaso, an infant 11 years of age, who fell from a cliff in Fillmore Glen State Park on May 22, 1954. Limited letters of administration were issued to claimant by the Surrogate of Cayuga County on August 5, 1954. The claim was timely and properly filed, and has not been assigned.
Claimant’s intestate was in the park as a member of a group of Cayuga County Boy Scouts who arrived the previous day for a “ Camporee ”. The group received permission from the officials at the park, and the admission fee was paid. The State *586 maintains this park for the use of the public, as a part of the State’s well-advertised State Park System. Whether or not a fee was paid, claimant’s intestate was an invitee.
The State is not an insurer of the safety of those coming to its public parks. Nevertheless, it is the duty of the State to take reasonable precautions to prevent injury and to keep and maintain the premises in a reasonably safe condition. It should guard against dangers as could or should have been foreseen or anticipated in the exercise of prudence and care. It should give notice and warning of any condition or circumstance to be encountered which may be dangerous or hazardous to persons unfamiliar therewith. In a death case, claimant is not held to as high a degree of proof as where an injured claimant can himself describe the occurrence. (Noseworthy v. City of New York, 298 N. Y. 76; Swensson v. New York, Albany Desp. Co., 309 N. Y. 497.)
The boy scouts arrived at the park on May 21. It rained very hard that night. Claimant’s intestate was in a group in charge of Stanley Chayka, scoutmaster. On the following morning, May 22, shortly after breakfast, with the scoutmaster’s permission, Anthony Malvaso, claimant’s intestate, age 11; James McConnell, age 11, Thomas Hickey, age 10; and Frederick Clark, age 13, started on a hike ¿round the park. Only two signs were seen on the ground level — one pointing the direction to the north rim trail and the other to the south rim trail. This group started up the north rim trail, went around behind the gorge, and started down the south rim trail. The total distance around on both trails was about eight miles. Of this, the south trail is two miles long, full of inclines and declines, winding through wooded and hilly territory. After walking and maneuvering along, the boys finally reached the south rim trail which leads down to the ground level. They walked in single file, with Frederick Clark in the lead and Malvaso at the rear. There was a discussion among them pertaining to locating some of the other boys, whose voices could be heard, and of finding a short way back to camp. Anxiety and concern were indicated.
There is no testimony positively identifying where decedent left the trail, or exactly what happened between the time he left the trail and his fall from the cliff. His pals heard no outcry or noise. It appears, however, by putting together the testimony of the three surviving boys and that of another witness, Michael Lawn, who was on the lower level and saw decedent fall, and measurements of the Park Superintendent, Patrick D. Conley, that the decedent left the trail about 400 feet from the *587 so-called “ Pinnacle ”. This is about the location where decedent expressed his intent to find the other boys whose voices could be heard. He was seen to get off the trail two or three steps to the left descending terrain. Frederick Clark told him that he had better not go down there. Clark gave no reason to decedent for such statement and said nothing more. Thomas Hickey stated that he saw decedent start back toward the trail. In any event, the boys kept walking ahead and did not notice decedent was missing until they had gone some distance. They then heard the boys below yelling that someone had fallen and to go get help. Then they turned, noticed decedent missing and called out to him with no answer. They proceeded on their way down the trail and later learned that Anthony Malvaso, claimant’s intestate, was the person who fell.
At the location where decedent started off, the trail was from 3 to 5 feet wide, with a surface of a mixture of dirt and gravel, and flanked on both sides by woods. To the boys’ left, toward the gorge, the terrain descended 40 to 50 feet, at an angle of 45 to 60 degrees, to the gorge, and terminating in an abrupt, sheer precipice about 150 feet above the ground below. This area was covered with growing trees, fallen trees, bushes, shrubbery, wet leaves and miscellaneous wild vegetation, growth and accumulations of many prior years. The State had never cleared or cleaned out this area between the trail and the gorge since the park was established in 1925. A reconstruction of the geographical facts present at the time, based on the testimony, which is not entirely in agreement as to whether the gorge could be seen by claimant, and considering the physical facts, the court is of the opinion that the decedent and his pals not only did not know where they were, but they did not know the gorge was only 40 to 50 feet from the trail, and at that point there was this dangerous drop-off. The court is not unmindful of the testimony of James J. Criazzo, who stated that he was there the day after the accident and when he got up on the trail during his investigation, he could see the gorge. But, it must be remembered that, at that time, he was not a stranger to the situation. He saw the cliff from the bottom first, and when he got up on the trail, he already knew what was there and what to look for. It cannot be assumed that because he saw the gorge that the decedent also saw it. It is also significant to note that the edge of the cliff was bordered with ground hemlock 3 feet to 4 feet high, and it is not difficult to understand how the decedent after pushing or walking through the maze of wild vegetation could emerge through the hemlock too late to stop.
*588 There are several ways this accident could have happened. It must be assumed that proper signs warning of the danger would have been seen and obeyed. The general terrain around this section was dangerous and hazardous. It constituted a trap. There were no warning signs, fences, guards or State attendants or guides to protect the claimant’s intestate against this dangerous and hazardous condition, or to warn him of this unknown trap.
The State failed in its duty to take reasonable precautions to prevent injury and to keep and maintain the premises in a reasonably safe condition, and to guard against dangers of which it had both actual and constructive notice over a long period of years. Proper care and prudence requires protection against these dangers and hazards. This failure is negligence.
Assuming that Frederick Clark advised decedent he ‘1 better not go down there ” and when he went off the trail, Thomas Hickey commanded bim to ‘ ‘ hurry up, we had to get back ’’, none of these statements gave decedent any reasons or explanations that would inform him of the dangers. He did not assume a risk unless he knew there was a risk. The State also maintains on the question of contributory negligence that before the boys started on the hike, scoutmaster Stanley Chayko, as testified by Frederick Clark, told the boys to stay on the trail. It does not appear that he told them anything pertaining to the dangers and hazards. McConnell did not hear any part of it. It does not appear that claimant’s intestate heard it.
The burden of proving contributory negligence in a death action is on the defendant. (Flynn v. Long Is. R. R. Co., 289 N. Y. 283; Decedent Estate Law, § 131.) This burden of proof may be properly sustained by the testimony of claimants. (Porter v. New York City Interborough Ry. Co., 235 App. Div. 525; affd. 261 N. Y. 587.)
The State’s burden of proof in this claim has not been met. It is insufficient to say that the danger was obvious. Substantially the whole trail, and particularly the area involved in this accident, was dangerous, and the State should have indicated with certainty that point beyond which it was reasonably unsafe to venture. (Kittle v. State of New York, 245 App. Div. 401, affd. 272 N. Y. 420; Brown v. State of New York, 176 Misc. 748, affd. 263 App. Div. 1045; Trimble v. State of New York, 263 App. Div. 233.)
The court finds that the State was negligent and such negligence was the proximate cause of the accident resulting in the death of Anthony Malvaso; and, further, that the said Anthony Malvaso was free from any contributory negligence.
*589 Claimant is entitled to an award for the just and fair compensation for the pecuniary injuries resulting from decedent’s death, together with reasonable funeral expenses.
At the time of his death, Anthony Malvaso was in the sixth grade. He was in good health and average intelligence. He performed chores for his parents and earned $7 or $8 per week on a paper route with his twin brother. This was used for the benefit of himself and members of his family.
The decedent was survived by his parents and nine brothers and sisters.. After an examination of awards in previous cases for comparable precedents and an adjustment thereof to present monetary values, claimant is entitled to an award of $19,000 as compensation for pecuniary injuries, together with $582.50 allowed for reasonable funeral expenses, consisting of $393 for the undertaker and $189.50 for cemetery lot, which the court holds is a part of the funeral expenses, making total award of $19,582.50, with interest thereon from May 22, 1954.
The foregoing constitutes the written and signed decision of this court upon which judgment may be entered. (Civ. Prac. Act, § 440.)
Judgment is directed accordingly.